AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

Jorge Manuel MACIAS,
  aka "Jorge Hector Macias,"
  aka "George Manuel Macias,"
  aka "George M. Macias,"
  aka "George Hector Macias,"
  aka "Manuel Jorge Macias," and

DANIEL ALVARO MACIAS,
  aka "Baro,"

          Defendant(s)

Case No.    2:22-mj-01279-duty

| LODGED |
| CLERK, U.S. DISTRICT COURT |
| 3/30/2022 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ____jb____ DEPUTY |

| FILED |
| CLERK, U.S. DISTRICT COURT |
| 3/30/2022 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ____jb____ DEPUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about

the date of May 25, 2021, in the county of Los Angeles in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 2 | Distribution of a Controlled Substance and Aiding and Abetting Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

 Please see attached affidavit.

☒ Continued on the attached sheet.

/s/ Angelica Childs
Complainant's signature

Angelica Childs,
Special Agent, Drug Enforcement Administration
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    3/30/2022

Judge's signature

City and state:    Los Angeles, California

Hon. Alexander F. MacKinnon, U.S. Magistrate Judge
Printed name and title

AUSA: Rachel N. Agress (x0487)

## **AFFIDAVIT**

I, Angelica Childs, being duly sworn, declare and state as follows:

## I.   **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of criminal complaints and arrest warrants against Jorge Manuel MACIAS, also known as ("aka") "Jorge Hector Macias," aka "George Manuel Macias," aka "George M. Macias," aka "George Hector Macias," aka "Manuel Jorge Macias," ("MACIAS") and Daniel ALVARO MACIAS, aka "Baro" ("ALVARO MACIAS"), each for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance and 18 U.S.C. § 2:  Aiding and Abetting Distribution of a Controlled Substance.

2.    This affidavit is also made in support of applications for warrants to search:

a.    The residence located at 6806 San Marcus Street, Paramount, California, 90723, in Los Angeles, in the Central District of California, registered to MACIAS (the "SUBJECT PREMISES"), as further described in Attachment A-1, where, as discussed below, based on surveillance, the SUBJECT VEHICLES (as defined below) have been parked before and after several narcotics transactions.  In addition, California DMV records show that MACIAS lists the SUBJECT PREMISES as his residence.

b.    A silver 2017 Ford Sedan bearing California license plate number 8AZM972, Vehicle Identification Number ("VIN") VIN3FA6P0LUXHR413727, registered to a "M.V." in Bellflower, California ("SUBJECT VEHICLE 1"), as further

described in Attachment A-2, and used by MACIAS during the course of drug trafficking activity;

c.   A black 2015 GMC Yukon bearing California license plate number 8YHY506, VIN 1GKS1CKJ4FR276820 registered to a "R.M." in in Mission Hills, California ("SUBJECT VEHICLE 2"), as further described in Attachment A-3, and used by MACIAS during the course of drug trafficking activity;

d.   A gold 2005 GMC Yukon XL, bearing California license plate 7NJN232, VIN 1GKFK66UX5J150947, registered to "Jorge Manuel Macias Jr.," at 1400 N Paulsen Ave, Compton, California 90222 ("SUBJECT VEHICLE 3"), as further described in Attachment A-4, used during the course of the investigation by MACIAS and ALVARO MACIAS;

e.   The person of MACIAS, as described further in Attachment A-5; and

f.   The person of ALVARO MACIAS, as described further in Attachment A-6.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), and 18 U.S.C. § 2 (aiding and abetting distribution of controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1 through A-6, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   BACKGROUND OF AFFIANT

5.    I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed since August 2019.

6.    I have received and completed formal training that included a 16-week DEA training program in Quantico, Virginia, including specialized training in the investigation of major narcotics trafficking organizations.  I have participated in the debriefing of defendants and informants who had personal knowledge regarding major narcotics trafficking organizations.  Additionally, I have participated in many aspects of drug investigations and conducted extensive surveillance in drug investigations.

7.    Through my training and experience, I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds

of narcotics trafficking, and money laundering.  I am also familiar with the sophisticated methods that drug organizations use to avoid detection by law enforcement.

### III.  SUMMARY OF PROBABLE CAUSE

8.    In or around November 2020, a DEA Confidential Source (the "CS")[1] provided DEA agents with MACIAS' name as a narcotics distributor in Paramount, California.  In around April 2021, the DEA began an investigation into MACIAS.  The CS had a preexisting relationship with MACIAS because they had previously worked for the same employer and the CS was MACIAS' direct supervisor.

9.    In a series of recorded calls and texts leading up to each transaction with the CS and/or a DEA Undercover Agent ("UC"),[2] MACIAS arranged the following narcotics sales, which occurred on the following respective dates: (i) on May 25, 2021, for $3,000, ALVARO MACIAS, MACIAS' son, sold the CS

---

[1] The CS began working with the DEA in connection with a state investigation into trafficking of cocaine by the CS.  The CS was in contact with the DEA since November 2020 and worked with the DEA from January 2021 through February 28, 2022, when the CS passed away.  The CS was not charged in the state investigation.  The CS provided information that has been corroborated and proven to be accurate.  While working as a confidential source, the CS provided information for DEA investigations which have led to seizures.  Most recently, the CS provided information in an investigation that led to the seizure of approximately $47,000 and the arrest of one target.  The information provided by the CS has been corroborated and has been proven to be reliable.  The CS had 1986 felony convictions for burglary in the second degree, a 1999 felony conviction for bank fraud, a 2004 conviction for escape from custody, and a 2017 felony conviction for carrying a loaded firearm, as well as numerous felony convictions for drug-related offenses (possession and trafficking).

[2]  Unless otherwise stated, all calls referenced in this affidavit were recorded and were in English.

approximately 880 grams of pure methamphetamine on MACIAS'
behalf, in front of the SUBJECT PREMISES; (ii) on July 23, 2021,
for $3,000, MACIAS sold the CS approximately 844 grams of pure
methamphetamine, with the UC present in the car during the
transaction; on September 10, 2021, MACIAS sold the CS
approximately 1,000 fentanyl pills for $4,000; and (iii) on
March 22, 2022, MACIAS sold the UC approximately 1,000 pills of
suspected fentanyl for $3,000 and approximately one pound of
suspected methamphetamine for $1,400.

10.   In a series of recorded calls and texts in March 2022,
MACIAS arranged to sell fifty pounds of methamphetamine to the
UC on March 31, 2022.

11.   The SUBJECT PREMISES is owned by MACIAS.  Based on
surveillance, MACIAS resides at the SUBJECT PREMISES with ALVARO
MACIAS and others, and they have resided there during the course
of the Subject Offenses.  In addition, law enforcement has
surveilled MACIAS leaving the SUBJECT PREMISES to drive to the
narcotics transactions on July 23, 2021, September 10, 2021, and
March 22, 2022, and returning to the SUBJECT PREMISES
afterwards.

12.   Recorded surveillance includes footage of the SUBJECT
VEHICLES regularly parked in front of or in the driveway of the
SUBJECT PREMISES, as recently as February and March 2022.  Law
enforcement has also surveilled MACIAS and/or ALVARO MACIAS
driving each of the SUBJECT VEHICLES numerous times during the
period of the investigation.  In addition, SUBJECT VEHICLES 1
and 2 were used by MACIAS to drive to/from narcotics

transactions and SUBJECT VEHICLE 3 was used by ALVARO MACIAS directly after a narcotics transaction.

### IV. STATEMENT OF PROBABLE CAUSE

13.     Based on my review of law enforcement reports and field notes, conversations with other law enforcement agents and officers, and my own knowledge of the investigation, I am aware of the following:

**A.     May 25, 2021: Sale of Approximately Two Pounds of Methamphetamine to the CS, Arranged by MACIAS and Carried Out by ALVARO MACIAS at the SUBJECT PREMISES**

14.     In or around November 2020, the CS provided DEA agents with MACIAS' name as a narcotics distributor in the Los Angeles area.  The CS had a preexisting relationship with MACIAS because they had previously worked for the same employer and the CS was MACIAS' direct supervisor.  In or around April 2021, the DEA began an investigation into MACIAS.

15.     In a series of recorded calls and texts from around April 21, 2021 through May 25, 2021, MACIAS arranged to sell approximately two pounds of methamphetamine to the CS at the SUBJECT PREMISES, which the CS understood to be MACIAS' residence in Los Angeles County.  During those communications, MACIAS quoted a price of $1,500, which based on my training and experience with methamphetamine dealers and the standard pricing of drugs, referred to $1,500 per pound of methamphetamine.

16.     On May 24, 2021, the night before the prearranged transaction, MACIAS informed the CS via a recorded call that he was sick, in the hospital, and that his son, referred to as "Baro" (later identified as ALVARO MACIAS) would complete the

transaction, because ALVARO MACIAS was taking care of the business in MACIAS' absence.

17.    On May 25, 2021, DEA agents searched the CS and his/her vehicle for currency and contraband with negative results.  The CS was then provided with devices to covertly audio and video record the planned controlled purchase, as well as $3,000.00 in official funds.

18.    DEA agents set up surveillance at the SUBJECT PREMISES.  The CS traveled to the SUBJECT PREMISES and placed a recorded call to ALVARO MACIAS, stating that the CS was outside. Shortly after, agents observe a Hispanic male (later identified as MACIAS's son, ALVARO MACIAS), exit the SUBJECT PREMISES with a bag and enter the CS's vehicle.  ALVARO MACIAS is identifiable on the CS's recorded video.

19.    The CS handed ALVARO MACIAS $3,000 cash, and ALVARO MACIAS handed the CS a bag.  The CS asked ALVARO MACIAS "have they been busted open yet," to which ALVARO MACIAS responds "no."  The CS then asked "there's two of them," to which ALVARO respnded, "there's two in there."  Law enforcement surveillance watched ALVARO MACIAS exit the CS's car and return inside the SUBJECT PREMISES.  The CS then departed and approximately five to ten minutes after the narcotics transaction, ALVARO MACIAS was surveilled getting into and driving away in SUBJECT VEHICLE 3.[3]  A later search of law enforcement database showed ALVARO MACIAS to be a resident of SUBJECT PREMISES, and he was

_____

[3] Agents generally followed the same pre- and post-deal procedure for each of the controlled purchases discussed in this affidavit, each of which were audio and video recorded.

identified based on his DMV photo as the individual who had conducted the deal with the CS.

20.   After the narcotics deal was conducted, MACIAS called the CS and asked if everything was good.  The CS replied yes, and MACIAS stated that he would see the CS on the next deal.

21.   DEA agents took possession of the bag, which contained two bricks of a white substance wrapped in duct tape and saran wrap.  A later DEA laboratory analysis confirmed it to be approximately 880 grams of methamphetamine.

**B.   July 23, 2021:  MACIAS Sells the CS Approximately Two Pounds of Methamphetamine**

22.   In a series of recorded calls and texts from around May 2021 through July 2021, MACIAS arranged to sell the CS another two pounds of methamphetamine on July 23, 2021 at a Target Department Store parking lot located at 6750 Cherry Avenue, Long Beach, California, 90805, which is in Los Angeles County.  During one of those communications, the CS also introduced MACIAS to the UC via phone as "my boy" who would be present at the deal.

23.   On July 23, 2021, in advance of the controlled purchase of narcotics from MACIAS, DEA Los Angeles Field Division ("LAFD") agents set up surveillance at the SUBJECT PREMISES and observed SUBJECT VEHICLE 1 parked directly in front of the SUBJECT PREMISES, on the street.  According to DMV records, SUBJECT VEHICLE 1 is registered to M.V.  Based on M.V.'s DMV photograph, law enforcement identified M.V. as someone who has been surveilled residing at the SUBJECT PREMISES

with MACIAS and ALVARO MACIAS.  In addition, law enforcement records show that utility bills for the SUBJECT PREMISES are in M.V.'s name.

24.  At approximately 11:18 a.m., the CS placed a recorded call to MACIAS and told MACIAS that the CS had arrived at the meeting place.  A few minutes later, LAFD agents surveilling the SUBJECT PREMISES observed MACIAS enter SUBJECT VEHICLE 1 and drive from the SUBJECT PREMISES to the meeting place.

25.  At approximately 11:25 a.m., aerial surveillance watched SUBJECT VEHICLE 1 enter the parking lot and park next to the CS's car.  MACIAS got into the CS's car, with the UC present in the car during the transaction.  MACIAS handed the UC the bag of narcotics, and the CS handed MACIAS $3,000.  Four minutes later, MACIAS exited the CS's vehicle, reentered SUBJECT VEHICLE 1 and left the parking lot.

26.  A later DEA laboratory analysis of the drugs confirmed it to be approximately 844 grams of methamphetamine.

### C.   September 10, 2021:  MACIAS sells the CS Approximately 1,000 Fentanyl Pills

27.  In a series of recorded calls and texts from around August 2021 through September 2021, MACIAS arranged to sell the CS 1,000 fentanyl pills.  Specifically, on September 9, 2021, the CS spoke with MACIAS on a recorded call, and informed MACIAS that he needed fentanyl pills.  MACIAS stated that they needed to stick to 1,000 pills for the first deal and referred to the pills as M-30s.  The CS asked if the price was $4 a pill and

MACIAS agreed.  The CS told MACIAS to meet him in the Whittier area for the September 10, 2021 narcotics transaction.

28.  On September 10, 2021, in advance of the controlled purchase of narcotics from MACIAS, Whittier Police Department Narcotics Team ("WPD") set up surveillance at the SUBJECT PREMISES.  At approximately 10:30 a.m., WPD observed SUBJECT VEHICLE 2 parked directly in front of the SUBJECT PREMISES on the street.  At approximately 10:58 a.m., WPD observed MACIAS enter SUBJECT VEHICLE 2 and drive from the SUBJECT PREMISES to towards Whittier, California.

29.  At approximately 11:14 a.m., the CS placed a recorded call to MACIAS and told him that s/he had arrived at the meeting place, which would be at a Target Department Store parking lot located at 10621 Carmenita Road, Santa Fe Springs, California, 90805, which is in Los Angeles County.  At approximately 11:23 a.m., aerial surveillance watched SUBJECT VEHICLE 2 enter the parking lot and park next to the CS's car.  Law enforcement surveillance identified MACIAS as he exited his car and entered the CS's car.  MACIAS can be seen on the CS's video taking a clear plastic baggie with pills from his shirt pocket and placing them in the car.  The CS then can be seen on video handing MACIAS $4,000 in cash.  At approximately 11:31 a.m., MACIAS exited the CS's vehicle, reentered SUBJECT VEHICLE 2 and left the parking lot, and returned to the SUBJECT PREMISES.

30.  The pills were later tested by DEA Southwest Laboratory and tested positive as 97.8 grams of a substance containing fentanyl.

### D.   March 22, 2022:  MACIAS Sells the UC Approximately 1,000 Fentanyl Pills and One Pound of Methamphetamine

31.   In a series of recorded calls and texts from around September 2021 through February 2022, MACIAS continued discuss narcotics sales with the CS.

32.   Following the CS's passing in February 2022, the UC reached out to MACIAS via text.  On March 15, 2022, via a phone call, the UC introduced himself as a friend of the CS.  The UC asked about a sale of 1,000 "buttons" and "windows."  Based on my training and experience, these are slang terms used by narcotics dealers for fentanyl pills and methamphetamine, respectively.  MACIAS quoted a price of $4 per pill and $1,300 or $1,400 for a pound of methamphetamine.  On a later call, MACIAS quoted a price of $3 per pill, and arranged to meet with the UC.

33.   On March 22, 2022, in advance of the controlled purchase of narcotics from MACIAS, WPD set up surveillance at the SUBJECT PREMISES.  At approximately 10:52 a.m., WPD observed SUBJECT VEHICLE 2 parked directly in front of the SUBJECT PREMISES.  At approximately 11:47 a.m., the UC told MACIAS to meet at the same Target Department Store parking lot in Long Beach where the July 23, 2021 deal took place, in Los Angeles County.  At approximately 11:52 a.m., WPD observed MACIAS enter SUBJECT VEHICLE 2 and drive from the SUBJECT PREMISES to towards Long Beach, California.

34.   At approximately 12:00 p.m., aerial surveillance watched SUBJECT VEHICLE 2 enter the parking lot and park next to

11

the CS's car.  At approximately 12:03 p.m., LAFD agents
observed MACIAS exit SUBJECT VEHICLE 2 and walk over to the CS's
car with a brown McDonalds paper bag in his hand.  At
approximately 12:07 p.m., MACIAS entered the passenger seat of
the UC vehicle.  MACIAS handed the UC a McDonalds bag and the UC
then handed MACIAS $4,400.  MACIAS exited the CS's vehicle,
reentered SUBJECT VEHICLE 2 and left the parking lot, and made
one stop before returning to the SUBJECT PREMISES.

35.  The brown bag was found to contain two clear plastic
bags: one plastic bag contained blue pills that field tested
positive for fentanyl; and the one plastic bag with white glassy
shards that field tested positive for methamphetamine.

### E.    MACIAS Arranges to Sell the UC Fifty Pounds of Methamphetamine in late March 2022

36.  In a series of recorded calls and texts in March 2022,
MACIAS arranged to sell fifty pounds of methamphetamine to the
UC on March 31, 2022, broken down into three transactions over
the course of the day.

### F.    Presence of MACIAS and ALVARO MACIAS at SUBJECT PREMISES, and Use of SUBJECT VEHICLES During the Course of Subject Offenses

37.  According to title records, the SUBJECT PREMISES is
owned in MACIAS's name.  Based on both recorded and unrecorded
law enforcement surveillance, MACIAS and ALVARO MACIAS have been
observed exiting and entering the SUBJECT PREMISES on numerous
occasions during the course of the Subject Offense, with MACIAS
observed exiting and reentering the SUBJECT PREMISES as recently
as March 29, 2022.

38.   In addition, the SUBJECT PREMISES has been frequented and used during the course of the Subject Offenses. Specifically, during the May 25, 2021 narcotics transaction, ALVARO MACIAS exited the residence with approximately two pounds of methamphetamine, and the transaction took place in front of the SUBJECT PREMISES.  In addition, law enforcement has surveilled MACIAS leaving the SUBJECT PREMISES to meet the CS and/or the UC, and returning to that premises during the July 23, 2021, September 10, 2021, and March 22, 2022 narcotics transactions.

39.   Law enforcement has surveilled MACIAS driving the SUBJECT VEHICLES multiple times during the period of the Subject Offenses.  Law enforcement has surveilled ALVARO MACIAS driving SUBJECT VEHICLE 3 multiple times during the period of the Subject Offenses.  Recorded surveillance of the SUBJECT PREMISES also includes footage of the SUBJECT VEHICLES in the driveway of the SUBJECT PREMISES or parked on the same block as the SUBJECT PREMISES during the period of the Subject Offenses, and as recently as February and/or March 2022.

40.   In addition, MACIAS was surveilled driving from the SUBJECT PREMISES to the narcotics transaction and back to the SUBJECT PREMISES afterwards on the following dates in the following vehicles: July 23, 2021 in SUBJECT VEHICLE 1; September 10, 2021 in SUBJECT VEHICLE 2; and March 22, 2022 in SUBJECT VEHICLE 2.  SUBJECT VEHICLE 3 was used by AlVARO MACIAS directly after the May 25, 2021 narcotics transaction at the

13

SUBJECT PREMISES.  Thus, the SUBJECT VEHICLES were used during the course of and/or in furtherance of the Subject Offenses.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

41.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences, stash houses, and vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.     Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences, stash houses, and vehicles.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences, stash houses, and vehicles, including in the form of calendar entries and location data.

e.     Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.     Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, stash houses, and vehicles.

g.     Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, stash houses, and vehicles, or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials,

and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

42.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

2.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

3.    The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.    Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress MACIAS's and ALVARO MACIAS's's thumb

19

and/or fingers on the device(s); and (2) hold the device(s) in front of MACIAS's and ALVARO MACIAS's faces with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

43.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  <u>CONCLUSION</u>

For all the reasons described above, there is probable cause to believe that MACIAS and ALVARO MACIAS have each committed a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance and 18 U.S.C. § 2:  Aiding and Abetting Distribution of a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of violations of the Subject Offenses, will be found in a search of the locations described in Attachments A-1 through A-6.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 30th day of
March, 2022.

_____
HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE